IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MILTON WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )   Civil Action No.: 3:21cv260 |
| | ) |
| | ) |
| TMS INTERNATIONAL, LLC, PATRICE ANN | ) |
| HLAVATY and PETER WEKENMANN, | ) |
| | ) |
| Defendants. | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Milton Williams, by counsel, and states the following as his Original Complaint against Defendant TMS International, LLC, Patrice Ann Hlavaty and Peter Wekenmann:

## NATURE OF THE ACTION

1.      This is an employment discrimination and retaliation action, brought pursuant to 42 U.S.C. § 1981 under federal question jurisdiction, as well as Virginia common law prohibiting discharge in violation of public policy and Virginia Code §§ 40.1-51.2:1, 2:2 within this Court's supplemental jurisdiction.

2.      Plaintiff Milton Williams ("Williams" or "Plaintiff") alleges that Defendant TMS International, LLC terminated his employment on a selective, and racially discriminatory basis, and in retaliation for reporting unsafe working conditions protected under Virginia statute and in further violation of recognized Virginia public policy.

3.      Plaintiff seeks monetary, declaratory, injunctive and equitable relief, including compensatory and punitive damages, and an award of costs, expenses, and attorneys' fees.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1981, Virginia Code §§ 40.1-51.2:1, 2:2 and Virginia common law.

5.      Jurisdiction is founded upon 28 U.S.C. § 1331 and 1367.  Venue is conferred upon this Court pursuant to 28 U.S.C. § 1391(b) in that the claims arose in Petersburg, Virginia, within this judicial district.

6.      Plaintiff has exhausted his state statutory claims by a filing a complaint with the Virginia Department of Labor and Industry (VOLI) and its Occupational Safety and Health Administration (VOSHA), which issued a right to sue letter to plaintiff to file this action against TMS International, LLC in accordance with Va, Code § 40.1-51.2:2(B).   No administrative filings are required as a prerequisite to suit under 42 U.S.C. § 1981 or the Virginia common law claims asserted.

## PARTIES

7.      Plaintiff is an African American male and was employed by TMS International, LLC from October 2, 2018 until his April 19, 2019 termination.  During his employment he operated a frontend loader at Defendant's Petersburg, Virginia location.

8.      TMS International, LLC, (formerly known as Tube City IMS, LLC) ("TMS") employed Plaintiff until the challenged termination. It is a provider of on-site, industrial steel mill services for steelmakers in 17 countries, and 90 sites, worldwide.  During all times pertinent hereto, it operated locally at 25805 Hoffheimer Way, Petersburg, Virginia 23803.  TMS's corporate office is located at Southside Works, Building One, Third Floor, 28 East Carson Street, Pittsburgh, PA

2

15203.  TMS International, LLC may be served at its registered agent for service: United Agent Group, Inc., 425 W. Washington Street, Suite 4, Suffolk, VA 23434-5320.

9.     Patrice Ann (Trisha) Hlavaty ("Hlavaty") was the General Manager for the TMS Petersburg, Virginia facility during all times pertinent hereto and made, or participated in, the employment decisions at issue.  Defendant Hlavaty is sued individually under 42 U.S.C. § 1981 and the common law wrongful discharge claims.  She may be served at her home: 13 Golden Sq. 5, Sayreville, NJ 08872-2306.

10.     Peter Wekenmann ("Wekenmann") was the site manager for the TMS Petersburg, Virginia facility during all times pertinent hereto and made, or participated in, the employment decisions at issue.  Defendant Wekenmann is sued individually under 42 U.S.C. § 1981 and the common law wrongful discharge claims.  He may be served at his place of business: Heritage Interactive Services, Berkeley Business Park, 5550 Winchester Avenue, Martinsburg, West Virginia 25405.

## FACTUAL ALLEGATIONS

Background of Site Operations

11.     On information and belief, Gerdau Ameristeel, Inc. (now doing business as Gerdau) has owned the site at which Plaintiff was employed since 2007 and contracts out certain of its operations, including to Plaintiff's employer, TMS International, LLC.

12.     In its 2019 fiscal year end Form 20-F reporting, Gerdau reports the manufacture of steel merchant bars and beams, using EAF mini-mill and rolling mill processes at its Petersburg facility.  During all times pertinent to the Plaintiff's claims, TMS operated the site as a contractor to Gerdau, recycling scrap steel in the production of slag construction byproducts and steel beams.

13. TMS claims to be the largest provider of industrial services to steel mills in North America. *See, e.g.* TMS International Form 10-k (2011) (listing the Petersburg facility as one of Gerdau Ameristeel, Inc.'s "North American Contract Rights Sites.")

14. TMS employed Plaintiff from October 2, 2018 as a full-time employee until it terminated his employment on April 19, 2019.

15. As part of its Petersburg location operations in 2018 and 2019, TMS recycled steel and steel byproducts to steel slag aggregate in a process that recycles steel scrap melted in an Electric Arc Furnace (EAF), followed by hot rolling and transport to external fabrication shops for fabrication.

16. The metal recovery (recycling) process involves heating steel to 3,000 degrees Fahrenheit in a furnace fueled by an electric arc that forms between the steel and electrical conductors lowered from the ceiling. The resulting molten steel flows to a ladle refining furnace, is poured into a "tundish" and channeled to a mold where it is reformed, cooled, metal is separated from slag by cranes, shaped and cut and slag is further processes for residual metalics and slag for aggregate products. The process yields 400,000 – 500,000 tons of steel annually at this facility.

17. Steel "slag" is a by-product of the process in which impurities are separated from molten steel when melted by the onsite arc furnaces. Slag is composed of silicates and oxides that solidify when cooled. Lances are lowered into the furnace to inject oxygen under pressure, which combines with and removes impurities in gaseous form, such as carbon monoxide, silicon, crystalline silica (as quartz), manganese, magnesium oxide, phosphorus and oxides, which combine with lime and dolime to form steel slag.

18.     These duties are performed by workers who load steel slag and include front end loader/operators ("Slag Plant Operators"), lancers ("Lance Operators"), maintenance staff and mechanics.

19.     As a "Slag Plant Operator," Plaintiff performed work operating a front-end loader mixing hot slag and moving the material to cool off with water and moved slag into a 'hoop' process and to dump trucks.  He also maintained conveyor belt pulleys, grease plant shoots and assisted the lancers in working with the slag.

20.     TMS recycles scrap steel worldwide using this process and is well aware of the danger of the airborne byproducts of the production process at the site of Plaintiff's employment. In its 2011 Form 10-k, Defendant TMS wrote:

> We are heavily regulated and closely monitored by environmental agencies because of the high level of environmental risk associated with our operations and those of our customers and competitors in the steel industry… We conduct regular worker safety compliance audits… All employees at a site are required to pass our medical surveillance program prior to performing work… Site construction incorporates all government required industrial hygiene and environmental safeguards. TMS International Form 10-k (2011), *id*.

21.     Notwithstanding the official position in federal filings suggesting proactive compliance with environmental hazards, onsite at the Petersburg facility, site management was aware of repeated health and safety hazards, including ongoing OSHA (Occupational Safety and Health Administration) violations.  TMS Petersburg management regularly threatened employees with termination if they contacted OSHA regarding safety concerns.

22.     Plaintiff worked ten-hour shifts, and often worked 50 or more hours per week.  As such, his exposures to the dust created in the manufacturing process was regular and pervasive.

## Selective Racial Practices by TMS and Wekenmann

23.     Defendant TMS, under Defendants Hlavaty's and Wekenmann's oversight, applied TMS personnel policy in a racially discriminatory fashion.

24.     Most of the employees assigned to the slag operations, with the known exposures to metal particulates, were African American.

### Petersburg Facility Workers' Exposure to Dangerous Airborne Particles and Gases Protected by State and Federal Law

25.     The manufacturing process at Plaintiff's workplace releases metals and other regulated toxins into the air, which required regular monitoring by Defendant TMS. In the course of this work, Plaintiff and other workers were regularly exposed to dangerous fumes and airborne metals including chromium, copper, iron oxide, lead, manganese, cristobalite quartz, lime, silicas and similar processing byproducts.

26.     Under Federal OSHA standards, adopted by Virginia VOSHA statutes and regulations assuring the right to a safe workplace free of known hazards, TMS was required to (1) identify the risks; (2) notify and train workers of the risks, methods to prevent harm and applicable OSHA standards and (2) implement protective measures to eliminate or reduce the risks to protect workers (including implementing processes to trap harmful fumes and/or ventilation systems to clean the air breathed.) Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651, *et al*.  *See, generally*, OSHA's "Workers Rights" publication which may be found at www.osha.gov.

27.     As part of these requirements, federal and state requirements for several of the above airborne metals and regulated toxins dictate that Defendant regularly test workers' worksite exposures. *See, e.g.* 29 CFR 1910.134(d)(1)(iii) (requiring that the employer identify and evaluate the respiratory hazard(s) in the workplace).

28.     Defendants were aware of the dangerous fumes and airborne metal particulates created in the manufacturing process at its Petersburg operations but failed to identify the risks, conduct and provide workers the results of medical testing or otherwise adequately maintain

protective equipment to protect its workers from these exposures, including, without limitation the frontend loaders operated by Plaintiff.

**The Regulatory Structure Applicable to the Petersburg Facility's
Health, Safety and Welfare Protections**

29.     For many years, OSHA has implemented Hazard Communications Standards at 29 CFR 1910.1200 regarding hazardous chemicals and the provision of Material Safety Data Sheets (MSDSs) to employees for such materials. These "right to know" rules were enhanced by OSHA in a final rule enacted in 2012.

Health Hazards Communications Standards

30.     Under OSHA standards, a health hazard requiring notification to workers includes chemicals that are carcinogens, toxic or highly toxic agents, reproductive toxins, irritants, corrosives, and sensitizers, among others.   Although Defendants were required to advise employees of such risks, Defendants flouted its obligations under the OSHA Hazard Communications Standards.

31.     OSHA publishes the harm that breathing airborne heavy metals, such as present at Defendant's Petersburg, Virginia worksite, which can be hazardous to health, including damage to lungs, nervous system and organs, including kidneys and liver.   *See, e.g.* https://www.osha.gov/toxic-metals:

> Toxic metals, including "heavy metals," are individual metals and metal compounds that negatively affect people's health… In very small amounts, many of these metals are necessary to support life.  However, in larger amounts, they become toxic.  They may build up in biological systems and become a significant health hazard…

*see also* 29 CFR 1926.55 "Gases, Vapors, Fumes, Dusts and Mists": Employers must limit an employee's exposure to any substance listed in Table 1 or 2.[1]

32.     Defendants were aware that Plaintiff and his coworkers were regularly exposed to airborne chromium, copper, iron oxide, lead, manganese, and silica particles (deemed toxic or hazardous and regulated by 29 CFR 1910), and that these particles were present in the manufacturing process at the Petersburg site, but failed to advise workers of these hazards, contrary to OSHA requirements or test and advise workers of their exposures.

Employee Rights to Report and Protect Themselves

33.     The protections listed by OSHA guarantee employees the right to report workplace hazards without risk of reprisal, the right to work on safe machines, the right to work free of toxic chemicals (including, as defined by OSHA, airborne metallic particles and fumes), and the right to get copies of tests taken by the employer to identify workplace hazards.  OSHA's website states this in simple, straightforward terms:

**Know Your Rights**

Federal law entitles you to a safe workplace. Your employer must keep your workplace free of known health and safety hazards. You have the right to speak up about hazards **without fear of retaliation**. You also have the right to:

- Receive workplace safety and health training in a language you understand
- Work on machines that are safe
- Receive required safety equipment, such as gloves or a harness and lifeline for falls
- Be protected from toxic chemicals
- Request an OSHA inspection, and speak to the inspector
- Report an injury or illness, and get copies of your medical records
- Review records of work-related injuries and illnesses
- See results of tests taken to find workplace hazards

(emphasis in original)

---

[1] These tables include dust and mist containing chromium compounds, copper, iron oxide and manganese compounds, the airborne metals to which Plaintiff was exposed.

The National Emphasis Program Specific to Metals Industries Involved in Refining

34.     In 2014, OSHA initiated a revised National Emphasis Program (NEP) to identify and reduce or eliminate worker exposures in facilities in the Primary Metal Industries, such as iron foundries and including steel fabrication such as conducted by TMS at the Petersburg site:

> OSHA inspection history indicates that individuals employed in the Primary Metal Industries are exposed to serious safety and health hazards on a daily basis. Previous inspections of primary metal establishments have resulted in citations for overexposures to a wide variety of health hazards including chemical exposures as well as physical stressors such as noise and heat…

> The Primary Metal Industries are a group of establishments engaged in the smelting and refining of both ferrous and nonferrous metals. These metals are refined from ore, pig and scrap, during rolling, drawing, casting and alloying metal operations. Some of the products they manufacture include nails, spikes, insulated wires and cables, steel piping, sheets and bars, copper and aluminum products, and coke…

Directive No. CPL 03-00-018, eff. October 20, 2014, amended CPL 02-02-079, Inspection Procedures, and January 1, 2016, without impacting this directive's enforcement policy.

35.     Metals dusts and chemical exposures to chromium, copper dust, iron oxide, and manganese dust each appear on the list of hazardous exposures in primary metal industries found at Exhibit A to the Directive described in Paragraph 34.

36.     At all times in question, Defendant TMS operated in a Primary Metal Industry, a group of establishments identified by OSHA in Exhibit A to the Directive described in Paragraph 34 engaged in smelting and refining of ferrous and nonferrous metals refined from ore, pig and scrap during rolling, drawing, casting and alloying metal operations.  *See also* OSHA Guidance for the Identification and Control of Safety and Health Hazards in Metal Scrap Recycling. https://www.osha.gov/sites/default/files/publications/OSHA3348-metal-scrap-recycling.pdf

Personal Protective Equipment Standards for the Airborne Metals Present at Plaintiff's Worksite

37.     OSHA's Personal Protective Equipment (PPE) Standards are found at 29 C.F.R. 1910 (Subpart 1), which establishes requirements for employers to evaluate the workplace and

identify PPE needs based on actual workplace hazards (respiratory protection standards may be found at 29 C.F.R. 1910.1000, 29 C.F.R. 1910.1026).

38.     Each of these standards establishes specific workplace requirements for personal monitoring, medical surveillance, engineering controls, respiratory protection, and training. OSHA outlines the dangers present in operations such as conducted by Defendant TMS, including exposures to hexavalent chromium, copper, chromium, iron oxide, and manganese.

**Defendant TMS Fails to Protect Workers as Required by Federal and State Law**

39.     Defendant TMS, and Defendants  Hlavaty and Wekenmann as its Petersburg site managers, failed in numerous aspects to provide a safe workplace, to monitor employees and their work environment, to promptly and effectively take corrective actions, and to provide transparency in doing so.

40.     Not only did Defendants fail to proactively provide this information, as required, they withheld the information about what was in the dust workers were breathing, despite repeated requests by employees.

41.     Defendants did not advise Plaintiff of the health risks associated with his work environment in accordance with OSHA and VOSHA standards.

42.     For over 4 months, Plaintiff worked with metal slag for 40 or more hours per week (typically 50 or more) without being advised of the health risks.  During this time, Plaintiff was not fitted for a respirator.

43.     When Plaintiff insisted on obtaining detailed information about the airborne dust in his workplace - and statutorily guaranteed workplace safety protections - Defendants retaliated against him. On information and belief, Defendants did this to suppress further opposition to Defendants' failures to meet OSHA standards and/or liability for the health effects of such

violations - as well as to avoid risks that the non-conforming operations would be closed by OSHA and/or VOSHA if the truth were known.

**<u>Plaintiff's Protected Opposition to Environmental Work Exposures</u>**

44.     Plaintiff became concerned with the dust in his workplace, and particularly in the frontend loader he operated.  He repeatedly raised these safety issues with Defendants. He questioned Defendants about the dust he breathed at work.  Having concealed these risks in violation of state and federal workplace safety standards, Defendants failed to act immediately to remedy the exposures.

45.     Plaintiff pointed out that the frontend loader he operated (#5761) was not equipped with working respiratory protections and had actual holes in the cabin that permitted metal laden dust to enter the cabin and which he was required to breathe to work.  Prior to Plaintiff's complaints, no respiratory devices designed to eliminate the risks had been provided. Plaintiff had not been provided information about the hazards or the results of any monitoring of levels.

46.     As Plaintiff researched the airborne byproducts typical of the steel recycling manufacturing process, he more vocally opposed the unsafe working conditions with his employer, protected activity under both federal and state law.

47.     Plaintiff repeatedly raised the issue with co-workers, with management and in group meetings with Defendants' supervision and other employees.  Plaintiff spoke directly with site manager Peter Wekenmann regarding holes in his frontend loader through which metal dust entered his direct work environment all day long.

48.     Defendant TMS had an independent responsibility to identify these risks without the prompting of a concerned employee.  It should have advised each employee of the risks and provided Plaintiff and other TMS employees the required MSDS data sheets.  Plaintiff was never

fitted for a respirator or advised of the hazardous contents of the slag and airborne metallic particles generated by the processes used by TMS. Defendants failed to address the concerns and the exposures continued.

49.     Plaintiff continued to raise such complaints about the dust both the week of, and day of, his discharge.

Air Samples Confirm Hazardous Exposures But Defendants Delay Worker Protections

50.     On February 21, 2019, employee-specific noise and air sample testing was finally conducted by a TMS contractor, Industrial Hygiene Specialty Services.  As part of the testing, Plaintiff was fitted for capturing samples of the air he breathed while working.

51.     As part of the testing, Mr. Wekenmann guaranteed Plaintiff that the frontend loaders would be sealed "at all costs." It was not – at least not while Plaintiff worked for TMS.

52.     The work conditions were not remedied. Holes in Plaintiff's frontend loader allowing dangerous metal dust were not repaired.

53.     On March 6, 2019 Plaintiff was called into a meeting and told that his cab would be fixed and that he needed to start wearing a respirator.  Plaintiff asked why and what the test results showed.  He was denied this information.   When he was never fitted for a respirator, he purchased over the counter disposable surgical masks to wear while performing his job.  These were not sufficient to eliminate the risks, which had still not been identified.

54.      Unbeknownst to Plaintiff, Defendant TMS had received the air sample results on March 6, confirming Plaintiff's exposure to airborne heavy metals.

55.     Over a month later, the cab was still not repaired, and the metals and silica-laden dust continued to infiltrate Plaintiff's workspace.

56.     Plaintiff continued to be very concerned about his exposures.

57. On March 11, 2019 Plaintiff felt weak and ill. TMS took him to the Gerdau nurse onsite, who checked his blood pressure. He was then sent home. The foreman, Mr. Blunt, told Plaintiff that he would be receiving a complete physical.

58. Plaintiff went to his personal physician that day and was prescribed blood pressure medication.

59. TMS provided Plaintiff no test results or medical incident report. To date, he has still not received any such test results, contrary to OSHA and VOSHA requirements.

Plaintiff Reiterates His Concerns and References His Legal Rights to Testing Results

60. On March 15, 2019, April 1, 2019, April 10, 2019 and April 17, 2019, Plaintiff continued to document complaints that the air conditioner on his frontend loader was not functioning, permitting further exposures, and that the "cab seal" on his frontend loader needed repair.[2]

61. Concerned about the exposures, Plaintiff also demanded access to the air sampling, but Defendants refused to provide this to him for review. Plaintiff asked for his test results on four separate occasions, twice from Defendant Wekenmann and twice from plant foreman John Blunt, Jr. Each time, his requests were brushed aside, and he was not given the results.

62. In response to one inquiry of Mr. Blunt, he told Plaintiff, "player, you are not getting any more money." This stated concern linking to the test results to money seemed off to Plaintiff and suggested to Plaintiff that TMS was aware of health concerns and were covering something up. His research revealed that he had a legal right to obtain the test results.

---

[2] Plaintiff additionally filed several complaints that the brakes on unit #922 were not working properly, separately a subject of OSHA and VOSHA safety standards.

63.     On March 25th, Plaintiff again asked to meet with the site manager, Wekenmann. His foreman, Mr. Blunt, waited in the lunchroom while Plaintiff met with Mr. Wekenmann in his office.  Again, Plaintiff requested the testing results.  Again, Mr. Wekenmann demurred.  Plaintiff told Mr. Wekenmann that the law required that he be provided a copy of the results. Mr. Wekenmann responded that he could not locate it.  Plaintiff observed a sheet that appeared to be testing results on Mr. Wekenmann' s desk (titled in bold **Industrial Hygiene Survey Data)** and directed it to his attention.

64.     Only then was he provided the February 21, 2019 air sampling test results, which showed exposures to silica, chromium, copper, iron oxide, and manganese specific to Plaintiff's workspace and also listed seven other employees' exposure levels. Before giving him the results, Mr. Wekenmann blacked out the other employees' names and exposures with a marker.  On information and belief, the coworkers were never provided these results.

65.     In the "Sample Comments," the report noted:

"Due to the high dust loading on this (testing) filter, an aliquot of the sample was analyzed resulting in elevated method reporting limits (MRLs) for silica."

"Fine particles adhering to the inside walls of the cassettes were included as part of the metal's analysis. The weight of these fine particles has not been included in the particulate results."

"If interferences are present in a silica sample, the sample is phosphoric acid digested (PAD) in an attempt to eliminate the interferences."

66.     In other words, even in the limited time of the testing, the amount of silica in the eight employees' air sampling was so great that it interfered with the normal sampling protocols.

67.     Although Defendant TMS's review (and records) confirm that Plaintiff's complaints were well founded, that front end loader's cab metal exterior was fatigued and permitted the dust to enter the cab, Defendant still failed to make immediate repairs to the frontend

loaders Plaintiffs and his co-workers were required to operate and otherwise act to protect employees.

**Plaintiffs is Removed From an Employee Safety Meeting After Raising His Concerns**

68.     In daily group "safety" meetings with co-workers, and in private with TMS management, Plaintiff continued to raise concerns with Defendant's supervision about the metal dust in the cabs, malfunctioning cab air conditioners and the attendant increased dust exposures.

69.     On April 17, 2019, Plaintiff again raised the issue of the leaking frontend loader cabs, this time in a safety meeting with Jim Lewis, the TMS plant executive who oversaw the safety meeting, and in the presence of co-workers.  Plaintiff specifically referenced the hazardous dust that he was breathing without the repairs.

70.     He was immediately removed from the meeting by the foreman, Mr. Blunt, who escorted him to see Defendant Wekenmann.  On the way upstairs, Mr. Blunt told Plaintiff that he was "breaking his coworkers' morale."  Plaintiff asked how raising safety questions with the safety man was breaking morale and reiterated that he had never been told of the hazardous materials in his working environment.

71.     Mr. Wekenmann questioned Plaintiff about his "interference with employee morale" and advised him that his frontend loader would be repaired.  Plaintiff returned to work.

**Plaintiff Contacts OSHA Regarding Unsafe Work Conditions**

72.     The following day, April 18, 2019, Plaintiff contacted OSHA by telephone on his lunch break and requested a meeting regarding his safety concerns.  He provided details about the dust exposures, the metals in the air sample, and his workplace concerns.

73.     He decided to request another meeting the following day to again raise these concerns.

74.     On April 19, 2019, Plaintiff asked the foreman, Mr. Blunt, for a meeting with the site management, Mr. Wekenmann and Ms. Hlavaty, to discuss his concerns. He informed Defendant's upper management, through Mr. Blunt, that he had reported his concerns to OSHA the previous day.  He told Mr. Blunt that he was going to work and to please call him when the meeting with Mr. Wekenmann and Ms. Hlavaty could be arranged.

### Plaintiff is Again Questioned and Removed from Work

75.     Plaintiff was called from his work to the office.  He was instructed to wait in Mr. Lewis' (the safety officer's) office.  After waiting several hours, Mr. Wekenmann appeared and asked Plaintiff why he was so upset.  Plaintiff responded that he was not upset.  Plaintiff reminded him that the meeting was about safety.  Wekenmann continued to repeat the question about why Plaintiff was upset. Each time Plaintiff responded that he was not upset.

76.     Mr. Wekenmann stepped out briefly and came back, repeating the question why Plaintiff was upset over and over.  Plaintiff continued to answer that he was not upset. This continued. Plaintiff finally responded that he was ready to work but wanted the cab sealed, as he had been promised and that he was tired of sitting in a room answering the same question over and over again.

77.     Wekenmann called head of maintenance to ask if the cab was ready.  The maintenance head told him, as far as he knew, it was, and Plaintiff said, "ok, since we're not having meeting I requested, I'm ready to get to work" and stood to return to work.  Defendant Wekenmann again began asking why he was upset and finally said that he could not allow Plaintiff to return to work because he "looked upset."  Plaintiff continued to respond that he was not upset.

78.     Wekenmann instructed Plaintiff to go home, that he would be paid for the rest of the day and told that the meeting would not occur until Monday.  Plaintiff responded that he

worked for his money and didn't want free money.  Mr. Wekenmann instructed him to go home and that they would meet when Ms. Hlavaty was available Monday.

79.     However, on information and belief, Defendant Wekenmann had already conferred with Defendant Hlavaty and determined to terminate Plaintiff's employment that day, and without a meeting on Monday.

80.     Plaintiff returned to his workstation to leave his radio, advised his co-workers that he was leaving, and went to the time clock area to clock out.  As he was trying to clock out, Mr. Lewis, the safety director, appeared and told Plaintiff to leave, treatment more consistent with a terminated employee than with that for an employee given the afternoon off.

81.     Mr. Lewis began to get aggressive.  Plaintiff backed up and told him twice that he was trying to clock out and call for a ride home. Plaintiff asked two coworkers blocking the time clock to please move so he could clock out.

82.     As he was calling for a ride home, Mr. Blunt then appeared and advised Plaintiff to leave the premises.

83.     When Plaintiff explained that he had called for a ride, Mr. Blunt began yelling, threatening to call security if he did not leave the property immediately.  Plaintiff objected to this treatment and the confrontation Blunt was clearly attempting to create.

84.     When it became clear that he would not be permitted to wait for his ride, Plaintiff begged any of his coworkers to please help him get home and out of the situation.  The lead lancer offered him a ride home.

85.     None of this action by TMS management, or at its instruction, was consistent with any TMS policy.  Plaintiff had not been disciplined or otherwise released from duty.  He was leaving for rest of the day (he thought) as asked to do by Defendant Wekenmann.

## **Plaintiff's Termination For "Refusal to Do Assigned Work"**

86.     An hour after arriving at his home, Mr. Wekenmann called Plaintiff to advise him that he for terminated for "refusal to do your assigned job".   This was false.  In fact, Defendant Wekenmann had refused to allow Plaintiff to return to work.

87.     Plaintiff's April 22, 2019 appeal of his termination to TMS was rejected by Defendants.

88.     Defendant's assertion that Plaintiff refused to work is false and a pretext for unlawful retaliation.  Plaintiff was terminated because he engaged in protected discussions to insist on a safe work environment.

89.     At the time of termination, Plaintiff had not been scheduled for follow-up blood testing or a physical.

90.     On information and belief, the action had it desired effect.  Plaintiff's co-workers who were also concerned about their exposures were reluctant to complain about safety issues or contract OSHA.  They were not provided the air sampling test results.

91.     Plaintiff later learned from co-workers that Defendants had still not repaired his front-end loader cab, contrary to what Defendants reported to VOSHA in defense of Plaintiff's administrative complaint.

92.     The temporal proximity between Plaintiff's complaints of workplace safety issues and the termination of his employment is irrefutable.  Plaintiff's termination immediately after complaints and before Defendants undertook *any* repairs to his frontend loader raises the inference that Plaintiff's protected conduct resulted in his termination, in violation of Va. Code §§ 40.1-51.2:1, 2:2.

93.    Plaintiff's protected conduct was a substantial, motivating reason for Plaintiff's discharge, in violation of the public policy underlying 16 VAC 25-60-110 and Virginia statutory enactments adopting federal workplace safety standards.

### Circumvention of OSHA Oversight and Spoliation of Evidence

94.    Plaintiff later learned from co-workers that Defendants destroyed the Plaintiff's frontend loader, presumably so as to prevent VOSHA examination.  Other machines in the slag operations also disappeared from the site.

95.    On information and belief Defendants continued to deny information regarding exposures to workers who remained at TMS.

### Defendants' Discriminatory Basis for Plaintiff's Termination

96.    Defendant TMS maintains a progressive or "stepped" disciplinary policy by which workplace discipline is supposed to be administered on a point system.

97.    Certain offenses subject an employee to immediate termination.   However, Defendants applied this in a selective and racially biased manner.

98.    The purported basis for Plaintiff's termination deviated from both the objective application of Defendant's stated personnel practices *and* in the asserted basis for discharge: Plaintiff's purported refusal to perform work.

99.    While the asserted "refusal" basis for discharge is false, even if it had been true, it was selectively applied – Caucasian employees who were accused of "refusal" to work were not discharged.

100.    Dennis Farrell, Caucasian male, was employed by TMS as a lancer for approximately three years.  In or about 2019, he *actually* refused to work but was not discharged.

101.    Jason Alexander, Caucasian male, was employed by TMS in the same capacity as Plaintiff, a "Slag Plant Operator" operating a front-end loader.  He *actually* refused to work in Plaintiff's frontend loader , but was not discharged.

102.    Defendants' differential disciplinary treatment between Plaintiff and his Caucasian co-workers is evident.

103.    But for Plaintiff's race, he would not have been terminated for the reason articulated by Defendants, as evidenced by Defendants' failure to terminate Caucasian employees Farrell or Alexander for the same asserted offense.

104.    Defendants' application of TMS disciplinary processes to terminate Plaintiff was selective as compared to Caucasian employees who not disciplined for the same alleged conduct.

105.    Plaintiff has suffered economic and non-economic damages proximately caused by Defendants' conduct.

### COUNT I
### 42 U.S.C. § 1981 (as amended)
### Unlawful Racial Discrimination in the Right to Contract
### (Against TMS and Wekenmann)

106.    Plaintiff incorporates by reference and reallege the preceding paragraphs as though set forth fully herein.

107.    Defendants TMS and Wekenmann discriminated against Plaintiff in violation of the rights afforded him by the Civil Rights Act of 1866, 42 U.S.C. § 1981.

108.    TMS, by and through the actions of its agents and representatives which it ratified and condoned, and Hlavaty and Wekenmann as its site management, intentionally discriminated against Plaintiff in his right to freely make and perform contracts on the same basis as white

persons, including all terms, conditions, benefits and privileges of such contracts, all as guaranteed to Plaintiff pursuant to 42 U.S.C. § 1981, *et seq*., as amended by the Civil Rights Act of 1991.

109.    TMS, Hlavaty and Wekenmann treated Plaintiff differently from Caucasian and other, non-African American workers because of his race (African American) in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

110.    But for the Plaintiff's race, and the Defendants' alleged conduct and interference with his ability to contract on the same basis as white citizens, Plaintiff would have been able to enjoy his contractual association with TMS, including the creation, performance, enjoyment, and all benefits and privileges of his contractual relationships with TMS.

111.    While the asserted basis for TMS's, Hlavaty's and Wekenmann' s termination of Plaintiff, "refusal to perform work," was pretextual and not the true basis for termination, Defendants selectively treated Plaintiff more harshly than identifiable Caucasian employees who were not terminated for the same form of misconduct asserted against Plaintiff.

112.    As applied to similarly situated Caucasian employees, the asserted reason for Plaintiff's termination was not a termination offense.

113.    TMS senior +management was aware of, and ratified, these actions in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

114.    TMS's, Hlavaty's and Wekenmann' s actions and conscious failures to act subjected Plaintiff to discriminatory treatment in the terms, conditions and privileges of his employment.

115.    TMS, Hlavaty and Wekenmann selectively terminated Plaintiff's employment, interfering with his existing contractual work relationship in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

116.    As a result of Defendants' unlawful termination, Plaintiff was not permitted on the TMS premises.   Access is checked by guards at a Gerdau maintained security gate who, on information and belief, maintain a list of persons not permitted onsite.

117.    Gerdau regularly employed former TMS employees at its own Petersburg site operations.   On information and belief, Defendants communicated Plaintiff's termination to onsite management at Gerdau Ameristeel, further damaging Plaintiff's right to freely to contract, in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

118.    As a consequence of TMS's, Hlavaty's and Wekenmann's intentional discrimination, Plaintiff has suffered, continues to suffer, and will in the future suffer emotional distress, anxiety, stress, embarrassment, humiliation, pain, and suffering.

119.    As a consequence of TMS's, Hlavaty's and Wekenmann's intentional discrimination, Plaintiff has lost wages and other financial incidents and benefits of his contract with TMS and related entities and will continue to suffer such losses.

120.    As a consequence of the acts and omissions of TMS, Hlavaty and Wekenmann, Plaintiff has incurred and will continue to incur other consequential and incidental damages.

121.    In the discriminatory actions alleged above, TMS, Hlavaty and Wekenmann have acted with malice or reckless indifference to the Plaintiff's rights, thereby entitling him to an award of punitive damages.

122.    To remedy the violation of the Plaintiff's rights secured by 42 U.S.C. § 1981, Plaintiff requests that the Court award him the relief prayed for below.

## COUNT II
### Common Law Termination in Violation of Virginia Public Policy
### Underlying Va. Code Title 40.1 (including § 40.1-51.2:1)
### (Against TMS, Hlavaty and Wekenmann)

123.     Plaintiff incorporates by reference and realleges the preceding paragraphs as though set forth fully herein.

124.     Virginia statutes, including Va. Code §§ 40.1, *et seq.* ("Protection of Employees"), evince and are based upon the public policy in Virginia to prevent and remedy unsafe working conditions.

125.     The public policy underlying Va. Code §§ 40.1, *et seq.* forbids the termination of at-will employees who are terminated for their opposition to unsafe working conditions including Plaintiff's assertion of health and safety rights and honoring duties provided by this Virginia law.

126.     The termination of Plaintiff's employment violates the public policy underlying Va. Code §§ 40.1-51,2:1 which states:

> "No person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this title for themselves or others."

127.     Virginia common law provides for a claim for public policy-based wrongful discharge. *See Bowman v. State Bank of Keysville, et al,* 229 Va. 534 (1985).   This claim has expressly been held to include retaliatory discharge in violation of Virginia public policies underlying statutory enactments to protect health, safety or welfare.  *See Miller v. SEVAMP*, 234 Va. 463 (1987).

128.     The Virginia common law retaliatory discharge remedy is in addition to any corollary protections provided by statute addressing the same set of operative facts.  *See Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 105 (1994).

129.     Plaintiff is clearly a member of the class of persons directly entitled to the protections directly entitled to the protection enumerated by the health, safety and welfare policy delineated in §40.1-51.2:1 of the Virginia Code.  As an employee working in an industry regulated as to employee exposures to hazardous airborne substances, Plaintiff had a statutory right to oppose and take actions to prevent unsafe working conditions for himself and other coworkers.

130.     Plaintiff exercised his statutory right when he opposed, and reported, Defendants' attempts to violate and/or circumvent the Virginia OSHA standards.

131.     Defendants' termination of Plaintiff's employment was a direct result of Plaintiff's actions opposing unsafe work conditions.

132.     The rationale given by Defendants for the termination of Plaintiff's employment are pretextual and not the true reason for the termination.

133.     Defendant TMS wrongfully terminated Plaintiff's employment in violation of the public policy underlying the cited Virginia statutory enactments. Defendants Hlavaty and Wekenmann acted in violation of public policy and directed and/or participated in the decision to terminate Plaintiff's employment.

134.     Defendants' conduct alleged herein was undertaken with malice, ill will and spite or, alternatively, undertaken with conscious and/or reckless disregard for the Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

135.     Plaintiff has been injured as a direct and proximate result of Defendants' wrongful discharge of his employment.  These injuries include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses, including attorneys' fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and

emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

### COUNT III
### Virginia Code §§40.1-51.2:1, 2:2
### <u>Statutory Retaliation for Opposition to Health and Safety Concerns</u>
### (Against TMS)

136.    Plaintiff incorporates by reference and realleges the preceding paragraphs as though set forth fully herein.

137.    Plaintiff opposed unsafe working conditions, filed a safety or health complaint and acted to exercise rights under the safety and health provisions of Code of Virginia, Title 40.1 for himself and for others.

138.    Plaintiff was discharged or otherwise discriminated against for his protected conduct.

139.    The rationale given by Defendant TMS for the termination of Plaintiff's employment are pretextual and not the true reason for the termination.

140.    Defendant TMS's termination of Plaintiff's employment was a direct result of Plaintiff's actions opposing unsafe work conditions, filing a complaint, and/or acting to exercise rights to protect the safety and health of himself or others.

141.    Plaintiff has been injured as a direct and proximate result of Defendant TMS's wrongful discharge of his employment.  Appropriate relief for these injuries include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses, reinstatement, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

**WHEREFORE,** Plaintiff prays that judgment be entered in his favor and against Defendant TMS, Inc. and requests, in addition, that this Court enter Orders, as follows:

## Declaratory Relief

(a) Declaring that the acts and practices complained of herein are in violation of Plaintiff's statutory rights as secured by 42 U.S.C. § 1981 and the public policy of the Commonwealth set forth in Virginia Code §§40.1-51.2:1 and 2:2;

## Equitable Relief

(b) Requiring that Defendant TMS reinstate Plaintiff to his original positions, or a position of equal duties and responsibilities, with equal pay and benefits, or in the alternative, to award Plaintiff front pay in lieu of reinstatement, as authorized by 42 U.S.C. § 1981 and/or as "appropriate relief" pursuant to Va. Code §40.1-51.2:2(B);

(c) Issuing a permanent injunction enjoining Defendant TMS from continuing or maintaining policies, practices or customs of denying, abridging, withholding or conditioning the making or enforcing of contractual rights on the basis of race, which rights are secured by 42 U.S.C. § 1981, as amended and/or Virginia Code §§40.1-51.2:1 and 2:2 and as to Defendants Hlavaty and Wekenmann enjoining them from negative employment references republishing the false basis for discharge;

(d) Awarding Plaintiff back pay, prejudgment interest, and other appropriate equitable relief for lost contractual benefits, including compensation and other employment benefits, and such other affirmative relief as may be appropriate, and for all other wages and other contractual entitlements lost or denied, against Defendant TMS, Inc. for violations of 42 U.S.C. § 1981, as amended;

**Damages Relief Pursuant to 42 U.S.C. §1981**

(e) Awarding Plaintiff compensatory damages under 42 U.S.C. §1981, as amended, against Defendants TMS, Hlavaty and Wekenmann, jointly and severally, in an amount to be determined by the jury at trial but not less than $350,000 per Defendant;

(f) Awarding Plaintiff punitive damages under 42 U.S.C. §§ 1981, as amended, against Defendants TMS, Inc., Hlavaty and Wekenmann, jointly and severally, in amounts to be determined by the jury at trial, but not less than $350,000 per Defendant;

**Damages Relief for Common Law Wrongful Discharge in Violation of Virginia Public Policy**

(g) Awarding Plaintiff compensatory damages available at common law against Defendants TMS, Hlavaty and Wekenmann, jointly and severally, in amounts to be determined by the jury at trial but not less than $350,000 per Defendant;

(h) Awarding Plaintiff punitive damages under common law against Defendants TMS, Hlavaty and Wekenmann, jointly and severally, in amounts to be determined by the jury at trial, but not less than $350,000 per Defendant;

**Damages Relief for Statutory Relief for Virginia Code §§40.1-51.2:1 and 40.1-51.2:2**

(i) Awarding Plaintiff an amount of appropriate relief, including actual damages against Defendant TMS for violation of Va. Code §§40.1-51.2:1 and 40.1-51.2:2, Count III, in an amount to be determined by the jury at trial but not less than $350,000;

**Tax Offset, Attorneys Fees, Costs and Other Relief**

(k) Awarding Plaintiff a separate amount to offset the adverse tax effects of lump sum payments of damages, back pay and/or front pay;

(l) Awarding Plaintiff attorneys' fees and costs incurred in this action, together with expert witness fees and expenses, for Count I against Defendants TMS, Hlavaty and Wekenmann, jointly and severally; and

(m) Ordering such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of this action for all claims so triable.

Respectfully submitted,

MILTON WILLIAMS

Harris D. Butler, III /s/
By:  Counsel

Harris D. Butler, III (VSB No. 26483)
Craig Curwood (VSB No. 43975)
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel:    (804) 648-4848
Fax:    (804) 237-0413
Email:  harris@butlercurwood.com
            craig@butlercurwood.com

John M. Janson (VSB No. 91236)
John M. Janson, Attorney at Law, PLLC
830 West High Street
South Hill, Virginia 23970
Tel:    (434) 953-8794
Fax:    (434) 774-2786
Email:  johnmjanson@email.com