IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MILTON WILLIAMS,
    Plaintiff,

v.                                                       Civil No. 3:21cv260 (DJN)

TMS INTERNATIONAL, LLC, *et al.*,
    Defendants.

**MEMORANDUM OPINION**
**(Granting Defendants' Motion to Dismiss Count Two)**

Plaintiff Milton Williams ("Plaintiff") brings this action against Defendants TMS International, LLC ("TMS"), Patrice Ann Hlavaty ("Hlavaty") and Peter Wekenmann ("Wekenmann") (collectively, "Defendants"), alleging violations of racial discrimination in the right to contract under 42 U.S.C. § 1981, common law retaliatory discharge, and statutory retaliation for opposition to health and safety concerns under Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2. This matter now comes before the Court on Defendants' Motion to Dismiss Count Two of Plaintiff's Complaint (ECF No. 8). For the reasons set forth below, the Court hereby GRANTS the Motion to Dismiss Count Two.

**I.    BACKGROUND**

At this stage, the Court must accept as true the facts set forth in the Complaint (ECF No. 1). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant Motion.

**A.    Factual Background**

TMS provides on-site, industrial steel mill services for steelmakers worldwide. (Compl. ¶ 8.) Plaintiff, an African-American man, worked full time as a front-end loader operator for

1

TMS at its plant in Petersburg, Virginia, from October 2, 2018, until his discharge on April 19, 2019. (Compl. ¶¶ 7, 14.) Hlavaty served as the general manager at TMS's facility in Petersburg throughout Plaintiff's employment. (Compl. ¶ 9.) Wekenmann served as the Peterburg facility's site manager during Plaintiff's employment. (Compl. ¶ 10.)

Since 2007, Gerdau Ameristeel, Inc. has owned the site where Plaintiff worked and contracted out some of its operations. (Compl. ¶ 11.) Gerdau engaged TMS to recycle steel and steel by-products into steel slag aggregate by melting steel scrap in an electric arc furnace, hot rolling, and transporting the steel aggregate to external fabrication shops. (Compl. ¶¶ 11, 15.) The Petersburg TMS facility produced 400,000-500,000 tons of steel annually. (Compl. ¶ 16.) As part of this process, Plaintiff operated a front-end loader that mixed and moved hot steel slag, a by-product of the recycling process consisting of silicates and oxides. (Compl. ¶¶ 17, 19.) Plaintiff's shifts at the plant lasted ten hours, and he often worked 50 or more hours per week. (Compl. ¶ 22.)

The steel manufacturing process exposed Plaintiff and his co-workers to dangerous airborne fumes and metals. (Compl. ¶ 25.) Plaintiff alleges that Defendants knew about these hazards but did not comply with the federal and state statutes and regulations that protect the right to a safe workplace free of known hazards. (Compl. ¶¶ 26, 28.) These regulations required TMS to (1) identify hazards; (2) notify and train workers in these hazards, harm prevention and applicable regulations; and (3) establish protections to eliminate or lower risks, such as methods of ventilation and trapping fumes. (Compl. ¶ 26 (citing Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, 84 Stat. 1590 (1970) (codified at 29 U.S.C. §§ 651-78); U.S. DEP'T OF LAB., OCCUPATIONAL SAFETY AND HEALTH ADMIN., OSHA 3021-06R 2017, WORKERS' RIGHTS (2017)).) Federal and state regulations also required TMS to frequently test workers' exposures

to airborne metals and regulated toxins. (Compl. ¶ 27 (citing 29 C.F.R. 1910.134(d)(1)(iii) (2021)).)

Specifically, Defendants did not provide Plaintiff and his co-workers with medical test results or properly maintain equipment in a way that would protect employees from harmful exposures. (Compl. ¶ 28.) Although plaintiff heard that he needed to wear a respirator during a meeting at the plant, Plaintiff never received one and resorted to buying his own disposable surgical masks to wear at work. (Compl. ¶¶ 48, 53.) Additionally, Defendants did not notify Plaintiff or other employees of the health risks of working in the Petersburg plant as federal and state regulations mandated, even after employees requested this information. (Compl. ¶¶ 40-41.) Management at the plant also threatened employees with termination for contacting the federal Occupational Health and Safety Administration ("OSHA") regarding health and safety concerns. (Compl. ¶ 21.)

Concerned about the contents of the airborne dust at the plant and in the front-end loader that he operated, Plaintiff questioned Defendants about the plant's air quality, researched the airborne by-products of steel production, discussed his worries with his co-workers and management, and became increasingly outspoken about health and safety issues at the plant. (Compl. ¶¶ 44-47.) Plaintiff became especially concerned about the dust that infiltrated the cabin of his front-end loader through holes. (Compl. ¶ 45.) During March and April 2019, Plaintiff lodged several complaints about air quality problems in his cabin, including directly to Wekenmann. (Compl. ¶ 47, 60.) Wekenmann told Plaintiff that he would have the cabin sealed, but the holes in the cabin remained unsealed during Plaintiff's employment. (Compl. ¶ 51.) In another conversation, Wekenmann told Plaintiff that his complaints harmed workplace morale at TMS. (Compl. ¶ 71.) Further, Plaintiff repeatedly requested the results of noise and air sample

3

testing that a contractor had conducted at the TMS plant in 2019, but he did not receive these results until he saw a copy of them on Wekenmann's desk. (Compl. ¶¶ 50, 53, 61-64.) The report indicated that the air at the plant contained an unusually high level of silica. (Compl. ¶¶ 65-66.)

The events that triggered Plaintiff's termination took place in April 2019. On April 18, 2019, Plaintiff contacted OSHA about his safety concerns and requested a meeting. (Compl. ¶ 72.) He also asked for a meeting with Wekenmann and Hlavaty, and informed "upper management" that he had reported his complaints to OSHA. (Compl. ¶ 74.)

Later that day, Plaintiff met with Wekenmann, who asked Plaintiff repeatedly what had made Plaintiff so "upset." (Compl. ¶¶ 75-76.) Plaintiff responded that he did not feel upset, but that he wanted someone to seal his loader's cabin. (Compl. ¶ 76.) Plaintiff eventually announced that since Hlavaty did not come to the meeting as he had requested, he had decided to return to work. (Compl. ¶ 77.) Wekenmann did not allow him to go back because he "looked upset." (Compl. ¶ 77.) Over Plaintiff's protests, Wekenmann told Plaintiff to go home for the day and that the two of them could meet with Hlavaty the following Monday. (Compl. ¶ 78.)

As Plaintiff prepared to go home, a safety officer told Plaintiff to leave and "began to get aggressive." (Compl. ¶¶ 80-81.) While Plaintiff waited for his ride, the officer again told Plaintiff to leave and loudly threatened to call security. (Compl. ¶ 83.) A co-worker then agreed to drive Plaintiff home. (Compl. ¶ 84.) Shortly after Plaintiff arrived at home, Wekenmann called Plaintiff to terminate his employment for "refusal to do [his] assigned job." (Compl. ¶ 86.) Plaintiff asserts that he did not refuse to perform his job. (Compl. ¶ 88.) Instead, Wekenmann had prevented him from carrying out his duties and used this incident as pretext to fire Plaintiff for complaining about workplace dangers. (Compl. ¶¶ 88, 92-93, 99.) Plaintiff

appealed his termination, and Defendants rejected his appeal. (Compl. ¶ 87.) Plaintiff later learned that Defendants destroyed Plaintiff's front-end loader and continually refused to provide information about hazardous exposures to workers, and that other slag-processing machines had disappeared. (Compl. ¶¶ 94-95.) Finally, Plaintiff alleges that Defendants applied TMS's disciplinary policies in a racially discriminatory way, as two white employees at the TMS Petersburg plant had previously refused to work but kept their positions. (Compl. ¶¶ 100-02.)

Plaintiff exhausted his state administrative remedies by filing a complaint with the Virginia Department of Labor and Industry and its Occupational Safety and Health Administration, which issued him a "right to sue letter" permitting him to file this action against TMS pursuant to § 40.1-51.2:2(B). (Compl. ¶ 6).

B.  **Plaintiff's Complaint**

On April 19, 2021, Plaintiff filed a Complaint against Defendants, raising three counts for relief based on the above allegations. Count One asserts a claim of Unlawful Racial Discrimination in the Right to Contract against all three Defendants, alleging that Defendants intentionally treated Plaintiff differently than other similarly situated white employees because of his race and interfered with his right to freely contract, including his right to maintain a contractual employment relationship with TMS. (Compl. ¶¶ 106-22.) Count Two asserts Common Law Termination in Violation of Virginia Public Policy against all three Defendants. (Compl. ¶¶ 123-35.) Specifically, Plaintiff alleges wrongful termination in violation of the Virginia public policy underlying Title 40.1 of the Virginia Code, including § 40.1-51.2:1, which prohibits discriminating against or discharging employees for filing health or safety complaints. (Compl. ¶¶ 123-35.) Plaintiff brings this claim pursuant to *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985), which provides for an exception to Virginia's at-will employment

5

doctrine and allows a cause of action for a termination that violates public policy. (Compl. ¶ 127 (citing *Bowman*, 331 S.E.2d 797).) Finally, Count Three asserts a violation of Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2 against TMS, alleging statutory retaliation for raising health and safety concerns. (Compl. ¶¶ 136-41.) Based on these claims, Plaintiff seeks declaratory and equitable relief, compensatory and punitive damages, and attorney's fees. (Compl. at 26-28.)

### C. Defendants' Motion to Dismiss

In response to Plaintiff's Complaint, Defendants filed a Motion to Dismiss (ECF. No. 8), moving to dismiss Count Two for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In support of their Motion, Defendants assert that § 40.1-51.2:2 provides the exclusive remedy for violations of the public policy set forth in § 40.1-51:2.1, which precludes Plaintiff from bringing a so-called *Bowman* claim for retaliatory discharge based on the statute. (Mem. in Supp. of Mot. to Dismiss Count II ("Defs'. Mem.") (ECF No. 9) at 4-8.) Plaintiff filed his response on July 14, 2021 (Pl.'s Br. in Opp'n to Defs'. Mot. to Dismiss Count II ("Pl.'s Mem.") (ECF No. 12)), and Defendants filed their Reply (Reply Mem. in Supp. of Mot. to Dismiss ("Defs'. Reply") (ECF No. 14)) on July 21, 2021, rendering Defendants' Motion to Dismiss now ripe for review.[1]

### II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding

---

[1] In their Memorandum, Defendant submit that their Motion to Dismiss suspends the time to file an Answer to the whole of the Complaint. (Defs'. Mem. at 9.) In the alternative, they request leave to file an Answer to the Complaint within ten days of receiving the Court's ruling on their Motion to Dismiss. (Defs'. Mem. at 9.) The Defendants filed their Answer on August 18, 2021. (ECF No. 20.) Because the Defendants have already filed their Answer, these requests are moot, and Court sees no need to address this issue.

the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III. ANALYSIS

Virginia adheres to an at-will presumption for employment, meaning that "when the intended duration of a contract for the rendition of services cannot be determined by fair inference from the terms of the contract," employment can last indefinitely, and an employer or

employee can end an employment relationship for virtually any reason with reasonable notice. *Bowman*, 331 S.E.2d. at 798 (citing *Stonega Coal and Coke Co. v. Louisville and Nashville R. R. Co.*, 55 S.E. 551, 552 (Va. 1906)). The Virginia Supreme Court first recognized an exception to this doctrine in *Bowman*. There, the court allowed a retaliatory discharge claim against a bank and its directors to proceed when two employees who held shares of the bank's stock lost their jobs, because they refused to vote for the bank management's proposed merger. *Id.* at 799, 801. The court reasoned that the bank management's actions violated the public policy underlying former Virginia Code § 13.1-32 (now codified as 13.1-662). *Id.* at 801. The statute, which stated that one share of stock received one vote on matters submitted for a vote at stockholder meetings, protected the underlying right of stockholders to vote their shares free from coercion and duress by corporate management. *Id.* Thus, the employees could sue in tort for a violation of this public policy. *Id.*

*Bowman* and its progeny have "consistently characterized [the public policy] exception[] as 'narrow.'" *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 796 S.E.2d 188, 190 (Va. 2017) (first citing *Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806, 808-09 (1996); then citing *Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 331 (Va. 1994); and then citing *Bowman*, 331 S.E.2d at 801)). Almost all statutes reflect some public policy, but the "termination of an employee in violation of the policy underlying any one [statute] does not automatically give rise to a common law cause of action for wrongful discharge." *City of Va. Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000). Rather, a *Bowman* claim may proceed in only three specific circumstances. *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002).

The first situation arises when an employer violated a public policy that a statute "explicitly expresse[s,] . . . and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *Id.* The second scenario occurs when an "an employer violated a policy enabling the exercise of an employee's statutorily created right." *Id.* In this circumstance, the relevant statute does not state the policy outright but instead furthers an implicit public policy goal. *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 918 (Va. 1987). Specifically, the legislature must have crafted the statute "to protect the property rights, personal freedoms, health, safety or welfare of the people in general." *Id.* The third and final situation applies when an employer discharged an employee for "refus[ing] to engage in a criminal act." *Rowan*, 559 S.E.2d at 711.

Here, Plaintiff claims that Count Two falls under the second category, alleging that Defendants wrongly terminated him in violation of the public policy underlying Virginia Code Title 40.1, which aims "to prevent and remedy unsafe working conditions." (Compl. ¶ 124.) Specifically, Plaintiff argues that his termination violated the public policy implicit in § 40.1-51.2:1, which prohibits discrimination against or discharge of an employee for filing a health or safety complaint. (Compl. ¶ 126 (citing § 40.1-51.2:1).). He also contends that he constitutes a member of the class of individuals that the statute aims to protect, because he works in an industry that regularly exposes him to "hazardous airborne substances." (Compl. ¶ 129.) These dangers render his right to complain about workplace health and safety conditions a vital protection. (Compl. ¶ 129.) However, the General Assembly of Virginia has already specially provided Plaintiff with the mechanism to protect that right.

### A. The Statutory Remedy that § 40.1-51.2:2 Provides Forecloses Plaintiff's *Bowman* Claim.

When adjudicating state law claims, federal courts must apply state law. *United States v. Little*, 52 F.3d 495, 498 (E.D. Va. 1995) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). In so doing, federal courts must use state law according to how the state's highest court has interpreted the law or anticipate how that court would rule. *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008). Because Count Two comes before the Court under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) (Compl. ¶ 1), and the Supreme Court of Virginia has not decided whether § 40.1-51.2:2 precludes a *Bowman* claim based on § 40.1-51.2:1, the Court must predict how the state supreme court would rule. *See id.* ("Because we are sitting in diversity, our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." (citing *Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir.2002)).

Decisions by Virginia courts and federal courts interpreting Virginia law indicate that the remedial procedure that § 40.1-51.2:2 outlines furnishes the exclusive remedy for violations of the public policy underlying § 40.1-51.2:1. The Supreme Court of Virginia has long held that "where a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." *Sch. Bd. v. Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989). By extension, when a statute creates a right and supplies a remedy for enforcing that right, Plaintiffs cannot successfully bring a *Bowman* claim. *See Carmack v. Virginia*, 2019 WL 1510333, at *13-14 (W.D. Va. Apr. 5, 2019) (finding that Va. Code § 2.2-3000, Virginia's State Grievance Procedure, contained a "formal process for resolving employment-related disputes" and could not give rise to a *Bowman* claim because that would "enable a plaintiff to

10

circumvent extensive remedial schemes crafted by the Virginia General Assembly, thereby rendering them a nullity").

The presence of an extensive statutory remedy indicates the legislature's intent to make a statute "self-contained . . . [so] that it would [not] also serve as an 'articulated public policy of the Commonwealth of Virginia' that could also serve as the basis of a *Bowman* type claim." *Gochenour v. Beasley*, 47 Va. Cir. 218, 224 (Va. Cir. Ct. 1998); *see also Humphrey v. Columbia/HCA John Randolph, Inc.*, 46 Va. Cir. 109, 111 (Va. Cir. Ct. 1998) ("[A] specific criminal penalty and enforcement mechanism created by the Virginia Drug Control Act [exists to punish] violation of this statute[, which] underscores the intent of the legislature . . . not to have a separate mechanism for civil enforcement under the exception to the employment-at-will doctrine."); *Cauthorne v. King*, 30 Va. Cir. 202, 204-05 (Va. Cir. Ct. 1993) (finding that because the Virginia Fair Housing Law, Va. Code §§ 36-96.1 to 96.23, furnishes remedies for violations of the statute such as complaints and civil actions, the plaintiff's *Bowman* claim based on the statute failed).

Here, § 40.1-51.2:2, which immediately follows § 40.1-51.2:1, prescribes an extensive remedial scheme that employees must follow when they believe their employer has discharged or discriminated against them for complaining about the health and safety conditions at their workplace. § 40.1-51.2:2; *see Bass v. E.I. Dupont de Nemours & Co.*, 28 Fed. Appx. 201, 205 (4th Cir. 2002) (affirming dismissal of wrongful termination claim under § 40.1-51.2:1 for failure to follow remedial procedure in § 40.1-51.2:2). Under that provision, employees must first exhaust their administrative remedies by filing a complaint with the Commissioner of Labor and Industry within 60 days after an alleged violation of § 40.1-51.2:1, which the Commissioner will investigate if he "deems [it] appropriate." § 40.1-51.2:2(A). If the Commissioner finds that

a violation occurred, then the Commissioner will attempt to have the parties to agree "to have the violation abated without economic loss to the employee." *Id.* If the parties cannot come to a resolution, then the Commissioner will bring an action in a state circuit court against the individual that the employee alleges committed discrimination. *Id.* The statute confers jurisdiction for the circuit court "to restrain violations and order appropriate relief," such as requiring the employer to rehire the employee with back pay plus interest. *Id.* If the Commissioner does not "issue a charge" against person whom the employee names in their complaint, the employee may bring an action in a circuit court against that person. § 40.1-51.2:2(B).

As Defendants highlight, numerous Virginia courts have concluded that § 40.1-51.2:2 provides the exclusive remedy for claims of retaliatory discharge resulting from an employee's health and safety complaints. *See Jenkins v. Heilig-Meyers Co.*, 57 Va. Cir. 448, 449-50 (Va. Cir. Ct. 1998) (finding that § 40.1-51.2:2 precludes a claim under the public policy exception for violations of the public policy protecting employees who make health and safety complaints about their workplace); *Judy v. Nat'l Fruit Prod. Co.*, 40 Va. Cir. 244, 244-45 (Va. Cir. Ct. 1996) (same); *Pruitt v. Johnston Mem'l Hosp.*, 21 Va. Cir. 188, 188-89 (Va. Cir. Ct. 1990) (same). A court will dismiss claims under § 40.1-51.2:1 if a plaintiff does not exhaust the administrative requirements in § 40.1-51.2:1. *Bass*, 28 Fed. Appx. at 205 (4th Cir. 2002); *Supinger v. Virginia*, 167 F. Supp. 3d 975, 820 (W.D. Va. 2016). In light of this precedent, Plaintiff's *Bowman* claim grounded on the public policy set forth in § 40.1-51.2:1 cannot proceed.

At bottom, the public policy exception to the at-will employment doctrine applies narrowly. *Wells*, 500 F. Supp. 3d at 487. The Virginia Supreme Court has limited the

exception's scope to circumstances where the exception has become necessary "for the goal of the statute to be realized and the public policy fulfilled." *Bowman*, 331 S.E.2d at 801. Of course, as Plaintiff argues, a particular set of facts "may give rise to several remedies, including common law tort remedies as well as federal statutory remedies." (Pl.'s Mem. at 6) (quoting *Lockhart*, 439 S.E.2d at 332).). But when a state statute already contains a remedial scheme for violations of a statutory right, a plaintiff does not need a *Bowman* claim to vindicate the statute's underlying public policy. *Cauthorne*, 30 Va. Cir. 204-05. Otherwise, a plaintiff could simply bring a *Bowman* action and bypass a statute's remedial scheme, thereby subverting the legislature's intent. *Carmack*, 2019 WL 1510333, at *14. As a result, the legislature need not explicitly state that a statute provides an exclusive remedy to preclude a *Bowman* claim, as Plaintiff posits (Pl.'s Mem. at 8-9). *See Jenkins*, 57 Va. Cir. at 450 ("To allow a broader remedy than the statute specifically provides, would require a court to abandon the principle of "strict construction" and destroy the legislative scheme as contemplated and created by the General Assembly."). Rather, the legislature must merely "clearly enunciate[]" a statutory remedy. *Id.*

Plaintiff counters this well-established law and incorrectly suggests that retaliatory discharge constitutes "a recognized common law tort" that requires an "express act of the legislature" to abrogate. (Pl.'s Mem. at 8.) Virginia does not recognize a "generalized cause of action for 'retaliatory discharge.'" *Miller*, 362 S.E.2d at 918; *see also Dunn v. Bergen Brunswig Drug Co.*, 848 F. Supp 645, 649 (E.D. Va. 1994) (denying jury trial for retaliatory discharge claim because no common law cause of action for retaliatory discharge exists in Virginia, and no jury trial right attached to plaintiff's claim as a result). Consequently, the General Assembly has enacted several statutes, including §§ 40.1-51.2:1 and 40.1-51.2:2, that delineate the circumstances under which employees may bring this kind of claim. *Ligon v. Cnty. of*

13

*Goochland*, 689 S.E.2d 666, 667, 669 (Va. 2010) (noting the Virginia Fraud Against Taxpayers Act, §§ 8.01-216.1 to 216.19; section 65.2-308, which prohibits firing an employee for filing a workers' compensation claim; and §§ 40.1-51.2:1 and 40.1-51.2:2 as examples of statutory causes of action for wrongful termination).

Virginia case law has long characterized wrongful discharge not as an "independent tort," *Dunn*, 848 F. Supp. at 649, but instead as a common law "*exception* to the at-will employment doctrine." *Miller*, 362 S.E.2d at 918. Even the Virginia Supreme Court case that Plaintiff cites in support of the proposition that wrongful discharge constitutes an independent tort, *Vanburen v. Grubb*, uses the terms "public policy exception" and "tort of wrongful discharge for public policy reasons" interchangeably (Pl.'s Mem. at 2-3). *Vanburen v. Grubb*, 733 S.E.2d 919, 922-23 (Va. 2012). *Bowman* itself, which Plaintiff also cites to bolster this argument, describes the cause of action as a "narrow exception to the employment-at-will rule." *Bowman*, 331 S.E.2d at 801. The Virginia Code creates a right and remedy to safeguard the underlying public policy at issue here. That remedy bars a *Bowman* claim despite the statute's lack of an express legislative pronouncement that the remedy precludes all others. *See Giannoutsos*, 380 S.E.2d at 649 (holding that when the legislature crafts a statutory right and remedy, the statute provides the sole remedy).

**B.     Plaintiff Offers No Alternative Bases for His *Bowman* Claim.**

With respect to Plaintiff's final arguments in his brief, Plaintiff correctly points out that "[p]ublic policy supporting the wrongful discharge tort may be found in multiple Virginia legislative pronouncements." (Pl.'s Mem. at 10.) Courts have permitted *Bowman* claims based on the public policies underlying a variety of statutes. *See, e.g., Mitchem v. Counts*, 523 S.E.2d 246, 252-53 (Va. 2000) (holding that the public policies embodied in two criminal statutes could

support a wrongful discharge claim); *Bowman*, 331 S.E.2d at 801 (concluding that the public policy implied in Virginia statute protecting right of stockholders to vote stock could form basis for wrongful discharge claim). Further, Plaintiff also accurately notes that one set of facts can violate public policies undergirding several different statutes, thereby providing multiple alternative grounds for a single wrongful discharge claim. (Pl.'s Mem. at 10 (citing *Mitchem*, 523 S.E.2d at 252).)

However, neither of these arguments apply in Plaintiff's case, because he proffers only one statute and its accompanying public policy as the basis for his claim. An employee-plaintiff bringing a claim under the public policy exception must identify a specific statute or statutes that express or imply the public policy that supports his cause of action. *Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806, 809 (Va. 1996). Here, Plaintiff appears to name both Chapter 3 of Title 40.1 of the Virginia Code, entitled "Protection of Employees," and § 40.1-51.2:1 as the grounds for his wrongful discharge claim. (Compl. ¶¶ 124-26; Pl.'s Mem. at 23.)

A sweeping citation to an entire chapter of the Virginia Code cannot support a claim for wrongful termination under the public policy exception, as the exception requires reference to a specific statute and its underlying public policy. *Cf. Jones v. HCA (Hosp. Corp. of Am.)*, 16 F. Supp. 3d 622, 636 (E.D. Va. 2015) (dismissing *Bowman* claim when plaintiff failed to identify the Virginia statute upon which he grounded the claim); *Brooks*, 465 S.E.2d at 809 ("[The plaintiff] does not have a cause of action for wrongful discharge because he is unable to identify any Virginia statute establishing a public policy that [his employer] violated."). This leaves Section § 40.1-51.2:1 as the sole specific code section on which Plaintiff relies in Count Two as the source of his claim. (*See* Compl. ¶¶ 124-26; Pl.'s Mem. at 9.) As discussed above, the Virginia Code already furnishes the exclusive remedy for violations of this provision, which

forecloses Plaintiff's *Bowman* claim. *See* § 40.1-51.2:2 (delineating the remedy for violations of § 40.1-51.2:2); *Jenkins*, 57 Va. Cir. at 449-50 (holding that § 40.1-51.2:2 prohibits *Bowman* claims based on § 40.1-51.2:1); *Judy*, 40 Va. Cir. at 244-45 (same); *Pruitt*, 21 Va. Cir. at 188-89 (same).

## IV. CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendants' Motion to Dismiss Count Two (ECF No. 8).[2]

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: September 7, 2021

---

[2] During the hearing on the Motion to Dismiss on September 7, 2021, counsel for Plaintiff requested that the Court certify to the Supreme Court of Virginia the question of whether the statutory remedy in § 40.1-51.2:2 precludes a *Bowman* claim based on § 40.1-51.2:1. The Court hereby DENIES certification. Rule 5:40 of the Rules of the Supreme Court of Virginia permits a federal district court to certify a question of Virginia law when the question "is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of [the Supreme Court of Virginia] or the Court of Appeals of Virginia." Va. Sup. Ct. R. 5:40(a). "The decision to certify . . . 'rests in the sound discretion of the federal court.'" *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 n.7 (2018) (quoting *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1157 (2017) (Sotomayor, J., concurring in judgment))). A federal district court should certify a question to the state supreme court only when "the available state law is clearly insufficient." *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994) (citing S*mith v. FCX, Inc.*, 744 F.2d 1378, 1379 (4th Cir. 1984)). The Court bears a "duty to decide questions of state law, even if difficult and uncertain." *Legard v. EQT Prod. Co.*, 771 F. Supp. 607, 609 (W.D. Va. 2011) (citing *Meredith v. City of Winter Haven*, 320 U.S. 228, 234-35 (1943)). Because certification diverts the time and resources of the Virginia Supreme Court, "the discretion to certify should be cautiously exercised." *West Am. Ins. Co. v. Bank of Isle of Wight*, 673 F. Supp. 760, 764 (E.D. Va. 1987). Although no Virginia Supreme Court case has directly addressed the question stated above, ample precedent on similar issues enables the Court to anticipate how the state supreme court would rule. As such, the Court declines to exercise its discretion to certify the issue.